UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUGELY FLORES, proposed administratrix
of the Estate of the Infant, M.F., deceased,
SUGELY FLORES Individually, YVELISE
BELTRE, proposed administratrix of the
Estate of the Infant, I.M., deceased, OSCAR
MORONTA and YVELISE BELTRE
individually,

                Plaintiffs,

       v.

THE CITY OF NEW YORK and
NATIONAL RAILROAD PASSENGER
CORPORATION d/b/a AMTRAK,

                Defendants.

No. 21-CV-5861 (RA)

<u>OPINION & ORDER</u>

---

RONNIE ABRAMS, United States District Judge:

     This case arises from a tragic accident in which two thirteen-year-old boys jumped off a bridge near a New York City park and drowned. On March 13, 2020, I.M. and M.F. (the "decedents") were with friends after school in a remote area of Inwood Hill Park in the Bronx, New York when they crossed onto the nearby Spuyten Duyvil Bridge (the "Bridge") and jumped into the water, resulting in the boys' deaths. The decedents' parents Sugely Flores and Yvelise Beltre ("Plaintiffs") filed this action alleging negligence, negligent hiring and supervision, and loss of services against the City of New York (the "City") and the National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak"), which own and operate Inwood Hill Park and the Bridge, respectively. Although Plaintiffs have settled their claims against Amtrak,[1] still pending before

---

[1] In light of the settlement, the Court denied Amtrak's Motion for Summary Judgment, ECF No. 65, as well as its Motion to Preclude or Strike the Report and Testimony of Plaintiffs' Expert, Joseph J. McHugh, ECF No. 62, as moot. Op. & Order, ECF No. 91.

this Court is the City's Motion for Summary Judgment, ECF No. 69 ("City's SJ Mot."). For the reasons that follow, the City's motion is granted.

## BACKGROUND

The following facts are undisputed unless otherwise noted.[2] On March 13, 2020, decedents I.M. and M.F. were thirteen years old when they went with three of their friends—B.U., A.L., and D.R.—to Inwood Hill Park after school. *See* City's 56.1 ¶ 3. Inwood Hill Park (the "Park") is a public park owned and maintained by the City, located on the northern tip of Manhattan. Pls.' Rule 56.1 ¶¶ 40, 42. That afternoon, I.M. suggested that the five friends go to the "beach" area of the Park. Pls.' 56.1 ¶¶ 63, 65; City's 56.1 ¶ 4. Although there is no dispute that the "beach" to which I.M. referred is on the City's property, it was not an officially designated area of the Park, but rather an open, sandy area situated along the river (the "Beach"). City's 56.1 ¶¶ 5–6; Pls.' 56.1 ¶ 131.[3] None of the rest of the group had been to the Beach area before. Pls.' 56.1 ¶ 63. D.R.—who was twelve or thirteen at that time, Roitman Decl. Ex. 5 ("D.R. Dep.") 9:23–24, ECF No. 72— testified that she had been to the Park "[m]ore [times] than I can count," but had never been to the Beach. D.R. Dep. 61:16–25; City's 56.1 ¶ 7; Pls.' 56.1 ¶ 63.

---

[2] In support of its motion for summary judgment, the City submitted a Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1, ECF No. 71 ("City's 56.1"), to which Plaintiffs responded, *see* Pls.' Counterstatement to City's 56.1, ECF No. 81 ("Response to City's 56.1"). Plaintiffs have also submitted a Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1(a), ECF Nos. 74, 80 ("Pls.' 56.1"), to which the City responded, *see* City's Response to Pls.' 56.1, ECF No. 83 ("Response to Pls.' 56.1"). Although Plaintiffs twice submitted a Rule 56.1 statement, *see* ECF Nos. 74, 80, the documents are identical in substance. Except where a fact is in dispute, the Court cites to the applicable Rule 56.1 statement rather than a party's response to the statement.

The Court disregards those portions of Rule 56.1 statements "that contain conclusory, argumentative, irrelevant, speculative, or unsupported assertions." *Dikambi v. City Univ. of New York*, 690 F. Supp. 3d 293, 301 (S.D.N.Y. 2023). It also assesses whether certain statements constitute hearsay, and, if so, whether a hearsay exception applies. *See Dilworth v. Goldberg*, No. 10–CV–2224 (JMF), 2014 WL 3798631, at *1 (S.D.N.Y. Aug. 1, 2014) ("As a general matter, when ruling on a motion for summary judgment, the Court may rely only on admissible evidence." (quoting *Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) (per curiam))).

[3] The Beach faces the Spuyten Duyvil Creek, also known as the Harlem River Ship Canal, which connects the Harlem River to the Hudson River. *See* Hastings Decl. Exs. V (Amtrak's Val Map), U (Inwood Hill Park Map), ECF No. 70; *see also* Roitman Decl. Ex. 6 (Wakesberg Dep.) 15:3–16, 22:13–16. The Court will refer to the waterway near the Beach and the bridge simply as the "river."

The five friends entered the Park some time after 4:00 p.m. and walked on a concrete trail for approximately twenty to twenty-five minutes. Pls.' 56.1 ¶ 14; City's 56.1 ¶ 8. They then left the concrete path and walked downhill, holding onto a rope attached to a tree, to reach the Beach. *Id.* ¶¶ 10, 13; Pls.' 56.1 ¶ 8. The parties disagree about whether the Beach and the hill that led to it were visible from the concrete path. Response to City's 56.1 ¶ 9, 15, 44, 46, 51. On D.R.'s account, after leaving the cement path, the kids walked through "a lot of trees" until, "[n]ot that far" away, they reached a circular area where something akin to a well was located; from there, the "trail" was located just to the right. D.R. Dep. 60:12–61:7. Although photographs of this area in the record depict a rope tied to trees, the City disputes that the photographs depict how the area looked on March 13, 2020; contests that the photographs depict a path or trail; and denies knowledge of or responsibility for the placement of the rope. City's 56.1 ¶¶ 11–12; Pls.' 56.1 ¶¶ 3, 28, 83, 95; Roitman Decl. Ex. 1 (Photographs). Plaintiffs concede that there is no evidence as to who tied it there or when. Response to City's 56.1 ¶¶ 11–12.

Whatever the "trail's" visibility, and regardless of who placed the rope, it is undisputed that the unpaved route the kids took that day was not a designated Park path, there were rocks on it, and D.R. testified that the kids used the rope to reach the bottom. City's 56.1 ¶¶ 13–14, 46, 50; Response to City's 56.1 ¶¶ 13–14, 46, 50; Pls.' 56.1 ¶ 30; D.R. Dep. 40:9–15. The bottom of the "trail" opened onto the Beach. City's 56.1 ¶ 9; Response to City's 56.1 ¶ 9. D.R. does not recall seeing signs warning visitors not to enter or access the Beach. Response to Pls.' 56.1 ¶ 17.

Upon reaching the Beach, the kids walked to the left, along the edge of the river, through a grassy area, and onto rocks abutting the Bridge, which is owned and operated exclusively by Amtrak. Pls.' 56.1 ¶ 18; City's 56.1 ¶¶ 16, 19–24; Roitman Decl. Ex. 1 (Photographs), at 8; Hastings Decl. Ex. S (Tadros Aff.) ¶ 5. It is undisputed that the City has no responsibility for

operating, inspecting, or maintaining the Bridge. City's 56.1 ¶¶ 22–24. According to D.R. and a City Department of Parks and Recreation (the "Parks Department") inspector, Figure 1 below generally depicts the Beach area as it appeared in 2020, as well as the rocks and Bridge abutting it. Pls.' 56.1 ¶¶ 37, 80; Response to Pls.' 56.1 ¶¶ 37, 80; D.R. Dep. 14:2–23; Wakesberg Dep. 58:13–60:12.



Fig. 1. Roitman Decl. Ex. 1, at 8 (Pls.' Ex. 13).

According to D.R., after hanging out on the rocks abutting the Bridge for approximately twenty minutes, I.M. climbed onto a ledge above the rocky area. Pls.' 56.1 ¶ 20; City's 56.1 ¶¶ 17, 25; D.R. Dep. 22:9–20. On this ledge, there is a fence that encloses the railroad tracks and leads onto the Bridge. City's 56.1 ¶¶ 17, 25; Pls.' 56.1 ¶ 21. Like the Bridge, this fence is owned and maintained by Amtrak. City's 56.1 ¶¶ 26–27. Holding onto the rails of Amtrak's fence, I.M. shuffled onto the Bridge. *Id.* ¶ 18; Pls.' 56.1 ¶ 21. After about four minutes, he jumped into the

river below. D.R. Dep. 23:17–25. I.M. exited the water without incident after this first jump. M.F. then deliberated for ten minutes about whether to jump in as well, but expressed hesitation, remarking to another friend, "like what if I don't make it back." D.R. Dep. 25:2–9. The decedents' friends told detectives that before M.F. jumped in, he said that he could not swim, a fact his parents later confirmed. City's 56.1 ¶ 29; Roitman Decl. Ex. 2 (Reyes-Flores Dep.) 45:15–16.[4]

D.R. did not go in the water that day. She testified that the current in the water appeared "strong" and "fast," and because of this she did not think doing so would be safe:[5]

> Q: Could you describe or could you recall the water on the beach area on the date of the accident, was it calm, was it shallow, was it deep, how was it?
> A: Well, when you get to the beach area, it looked pretty calm, but when you get to the rock area, it looked like really deep and the current was like going fast.

D.R. Dep. 38:6–13.

> Q: Now the water in this photograph, was it similar to how it was on the day of the accident or was it different or something else?
> A: It was different.
> Q: How was it different?
> A: Well, at the beach area, it was like still not -- it was calming, but when you get to the rocks like around the rocks, the current was moving fast. It was like moving crazy.
> Q: Was the water that is under the bridge, this is not how it looked like on the date of the accident just to clarify?
> A: No.
> Q: Did it look calmer or worse or something else?
> A: A little bit worse.

*Id.* at 48:4–19.

> Q: And when you say the water looked weird [when M.F. was in the water], what do you mean by that?
> A: Like it looked like the current was really strong.

*Id.* at 27:13–16.

> Q: And what happened when [I.M.] tried to rescue [M.F.]?
> A: The current came stronger and it took them both under the bridge.

---

[4] D.R. was not aware that M.F. did not know how to swim until after he entered the water. D.R. Dep. 68:11–17. She nonetheless testified that she told him, "if you don't know how to swim, don't jump." *Id.* at 69:5–6.

[5] Like M.F., D.R. did not know how to swim. D.R. Dep. 69:19–20.

*Id.* at 28:8–11.

> Q: [Y]ou mentioned earlier that when you got to this [Beach] area, the water looked calm, but then when you got to the rocks area, the water looked really deep and strong; is that right?
> A: Yes.
> Q: Okay. And did you think it would be safe for the boys to jump into water that was really deep and strong at that time?
> A: No. That's why I didn't jump in. Like I was over thinking it. I kept looking at the water.

*Id.* at 73:18–74:5.

Soon after jumping in, M.F. began struggling and called for help. City's 56.1 ¶ 31. I.M. then jumped into the river to help M.F. *Id.* ¶ 32. Tragically, both boys were swept away by the current. *Id.* ¶ 33. Autopsies revealed that the cause of death for both boys was drowning. *Id.* ¶ 38.

Plaintiffs together with Oscar Moronta filed notices of claim against the City in August 2020, and filed suit against both Defendants in New York Supreme Court in June 2021. Hastings Decl. Exs. A (Beltre and Moronta Notice of Claim), B (Flores Notice of Claim), C (Notice of Removal). Amtrak removed this case on July 8, 2021. Notice of Removal, ECF No. 2. Moronta has since voluntarily dismissed his claims with prejudice. *See* Bryton Decl. Ex. W (Stipulation of Voluntary Dismissal), ECF No. 66. Plaintiffs later settled their claims against Amtrak. *See* Order, ECF No. 90.

After the initiation of this action, the City searched its databases for records related to the Park in the two years prior to Plaintiffs' passing, but did not uncover any accident or incident reports or complaints. City's 56.1 ¶¶ 39–43. The City's Parks Department employs an inspection unit that conducts inspections for City-owned parks, including Inwood Hill Park. Pls.' 56.1 ¶ 40; Response to Pls.' 56.1 ¶ 40. Two Parks Department employees were deposed in this case. Malcolm Jenkins was the Parks Department supervisor assigned to the Park at the time of the incident. City's 56.1 ¶ 43. Mr. Jenkins testified that he had never been to the Beach area of the Park, *id.* ¶ 45, never

6

observed people in the Beach area before the incident, Pls.' 56.1 ¶ 92, and was not aware of a rope leading to the Beach, *id.* ¶¶ 95–97.

Joshua Wakesberg, an inspector employed by the Parks Department for twenty-one years, testified that he had performed prior inspections of the Park, including one in 2020. *Id.* ¶¶ 39, 41. Wakesberg said he "can['t] think of" areas of the Park where the public is not allowed to visit. Wakesberg Dep. 23:10–12; *see also* Pls.' 56.1 ¶ 53. He expressed familiarity with the Bridge and acknowledged having seen people in the Beach area of the Park before March 2020. Pls.' 56.1 ¶¶ 45, 52. Indeed, a photograph of Wakesberg from October 2018 pictures him during an inspection on the Beach. *Id.* ¶¶ 64–67, 70. Wakesberg stated that he did not observe a rope at the time of the inspection or know why it would be placed there; if he had seen a rope, he would have made a note for it to be removed. *Id.* ¶¶ 70, 83. Wakesberg did not recall if there were signs or warnings about the current, or warning against entering the water, or climbing onto the rocks or Bridge. *Id.* ¶ 60. He expressed awareness that there are "strong currents" in the river, *id.* ¶ 59; Wakesberg Dep. 27:14–17, 28:19–22, but said he has never observed anyone swimming in the water there before, *id.* at 22:9–12.

## LEGAL STANDARD

The Court will grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009).[6] In considering whether a genuine dispute of material fact

---

[6] Unless otherwise indicated, quotations omit all citations, quotation marks, footnotes, and omissions, and adopt alterations.

exists, the Court views the facts "in the light most favorable to plaintiff's case." *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

## DISCUSSION

For the reasons that follow, the Court grants the City's motion for summary judgment on each of Plaintiffs' claims: negligence, negligent hiring and supervision, and loss of services.

## I.    Negligence

The City argues that it is entitled to summary judgment on Plaintiffs' negligence claim for three principal reasons. First, it had no duty to warn of potentially dangerous conditions on Amtrak's adjacent property. Second, it had no duty to warn of open and obvious conditions that were natural features of the Park. Third, the City's actions were not the proximate cause of decedents' injuries.[7] Plaintiffs oppose each point, arguing that (1) the City was not "just an adjacent landowner," but rather had a duty to warn because it exposed Plaintiffs to "the exact same hazards of the strong current of the water" whether decedents accessed the river from the City's or Amtrak's property; (2) the river current presented a latent, non-obvious danger of which the City had a duty to warn; and (3) questions of fact as to proximate cause preclude summary judgment. Pls.' Opp'n to City's Mot. for Summary Judgment 6–13, ECF No. 79 ("Opp'n").

The Court agrees with the City that the record does not establish facts that gave rise to a duty to warn. Because the City did not have a duty, it was not liable for negligence. The Court also concludes that the City's conduct was not a proximate cause of the decedents' injuries. The City's motion for summary judgment on the issue of negligence is therefore granted.

---

[7] The City also argues it had no duty to prevent access to the Beach or Bridge through fences or barriers, because the Beach is a "natural geographical feature which did not represent a latent danger or condition." City's SJ Mot. 14. Because Plaintiffs' brief does not argue that the City had a duty to erect barriers, the Court does not address this issue.

### A. The City's Duty

There is no dispute that New York law governs Plaintiffs' tort claims in this action. "On a summary judgment motion in an action for negligence, the plaintiff must introduce adequate evidence on each element of negligence sufficient to support a favorable jury verdict, and in cases where proof of any essential element falls short the case should go no further." *Nussbaum v. Metro-N. Commuter R.R.*, 994 F. Supp. 2d 483, 490–91 (S.D.N.Y. 2014). "In New York, establishing a prima facie case of negligence requires the plaintiff to demonstrate that the defendant owed the plaintiff a duty, that the defendant breached that duty, and that, as result, the plaintiff suffered an injury." *Id.* at 491.

"Although a jury determines whether and to what extent a particular duty was breached, it is for the court first to determine whether any duty exists, taking into consideration the reasonable expectations of the parties and society generally. The scope of any such duty of care varies with the foreseeability of the possible harm." *Tagle v. Jakob*, 763 N.E.2d 107, 109 (N.Y. 2001). "[T]he factors to be considered in determining to whom a duty, if any, was owed are the likelihood of injury to another from a dangerous condition or instrumentality on the property and the foreseeability of a potential plaintiff's presence on the property." *Mesick v. State*, 504 N.Y.S.2d 279, 281 (N.Y. App. Div. 1986).

#### 1. Duty to Warn of a Condition on Amtrak's Property

The City argues, first, that as "a mere adjacent property owner," it "had no duty to warn of or remedy the allegedly dangerous and defective condition on Amtrak's property, unless [it] caused or contributed to the condition." City's SJ Mot. 8. The Court agrees.

"It is well settled that an owner or occupier of abutting property owes no duty of care to others to warn them of or protect them from a defective or dangerous condition on neighboring

premises." *Gehler v. City of New York*, 692 N.Y.S.2d 397, 398 (N.Y. App. Div. 1999). Indeed, as a general rule, there is good reason not to impose liability for conditions on neighboring properties: "Not only would this duty create an unreasonably onerous burden upon the owner, but it is difficult to discern how the line would be drawn with respect to when a condition existing upon one piece of property becomes a dangerous or defective condition upon the neighboring land." *Galindo v. Town of Clarkstown*, 759 N.Y.S.2d 757, 759 (N.Y. App. Div. 2003).

While "an exception to this rule arises where the owner of the abutting property causes or contributes to the condition," there is no such evidence here. *Pensabene v. Incorporated Vill. of Valley Stream*, 609 N.Y.S.2d 75, 76 (N.Y. App Div. 1994). It is undisputed that the Bridge is owned and operated solely by Amtrak. City's 56.1 ¶¶ 19–24. There is no evidence that the City caused or contributed to a condition on the Bridge or encouraged parkgoers to use the Bridge. Nor is there evidence that the City was aware of parkgoers accessing the abutting Amtrak property and jumping from the Bridge. *See* Pls.' 56.1 ¶¶ 87, 92; Response to Pls.' 56.1 ¶¶ 87, 92; *see generally* Wakesberg Dep. Accordingly, at the time of the incident, the City had no duty to warn of danger that the Bridge may have posed to parkgoers.

Plaintiffs insist that the City was more than "just an adjacent landowner," presumably because decedents' injuries arose not from the Bridge but from the water itself. Opp'n 6. The City, they maintain, provided access "to the exact same hazards" as Amtrak.[8] *Id.* It is true that this fact distinguishes this case from the prototypical adjacent landowner action. However, to the extent Plaintiffs are arguing that the City's provision of access not just to the Bridge but to the water,

---

[8] Because neither party addresses what entity owns the bed of the Spuyten Duyvil Creek, the Court proceeds on the assumption that its ownership does not alter the negligence analysis.

along with its knowledge of the water's danger, gave rise to a duty to warn, the Court considers and rejects this argument for the reasons set forth below.

### 2. Duty to Warn Against Open & Obvious Condition

The City further argues that the river constituted an open and obvious condition about which it had no duty to warn. City's SJ Mot. 13. Plaintiffs urge, to the contrary, that the City had a duty to post a sign prohibiting swimming or warning of the river's currents, because the currents were not open and obvious. Opp'n 7–9. But even if the City had a duty to warn of a hazard accessed from the adjacent Amtrak property, the record compels the Court to agree with the City that it had no duty to warn of the river or its currents.

Like any landowner, the City "owe[d] a duty to exercise reasonable care in maintaining its property in a safe condition under all of the circumstances, including the likelihood of injury to others, the seriousness of the potential injuries, the burden of avoiding the risk, and the foreseeability of a potential plaintiff's presence on the property." *Doyle v. State*, 705 N.Y.S.2d 389, 390–91 (N.Y. App. Div. 2000). While a landowner "has a duty to take reasonable precautions to prevent accidents which might foreseeably occur as the result of dangerous terrain on its property, by posting warning signs or otherwise neutralizing dangerous conditions," this duty "does not extend to open and obvious conditions that are natural geographic phenomena which can readily be observed by those employing the reasonable use of their senses." *See Cohen v. State*, 854 N.Y.S.2d 253, 255 (N.Y. App. Div. 2008).

The City relies on *Torres v. City of New York*, in which a "14-year-old decedent drowned after she and friends scaled a fence, ignored signs prohibiting swimming, and entered into the Bronx River, which runs through River Park, even though she did not know how to swim." 961 N.Y.S.2d 439, 439 (N.Y. App. Div. 2013). In *Torres*, the First Department granted summary

judgment for the City, explaining that the City's "duty to take reasonable precautions does not extend to open and obvious conditions that are natural geographic phenomena which can readily be observed" and that "risk of drowning at the location of the river where the decedent drowned was open and obvious, particularly to a non-swimmer." *Id.* at 439–40. Plaintiffs attempt to distinguish *Torres*, arguing that the swimmer in that case had ignored signs prohibiting swimming, whereas here, there is no evidence of comparable signs being posted. This Court agrees with the City that the implication of *Torres* is that the signs prohibiting swimming were unnecessary because the risk of drowning was open and obvious. *See id.* at 440. Moreover, the undisputed facts and well-established case law compel the Court to agree with the City that, consistent with *Torres*, the City had no duty to erect such signs.

In an array of factual circumstances, courts have repeatedly held that a landowner does not have a duty to warn when the dangers are naturally occurring and open and obvious. *See Melendez v. City of New York*, 906 N.Y.S.2d 263, 264 (N.Y. App. Div. 2010) (holding the City had no duty to warn where "[t]he danger of climbing out on the wet ledge of the waterfall was apparent and plaintiff could reasonably have anticipated it"); *Doyle*, 705 N.Y.S.2d at 391 (finding the City had no duty to warn where "sign indicating that the park closed at dusk was readily apparent to visitors . . . as was the danger of falling over the cliff at the edge of the plateau"); *Tushaj v. City of New York*, 685 N.Y.S.2d 64, 64 (N.Y. App. Div. 1999) ("[B]ecause it is clear that the cliff was an open and obvious natural feature of the landscape," and was not "hidden by vegetation," "the City had no duty to post warning signs or to erect additional barriers to protect park visitors from it."); *see also Cohen v. Elephant Rock Beach Club, Inc.*, 63 F. Supp. 3d 130, 146 (D. Mass. 2014) ("If [the danger of jumping from a natural rock formation on an adjacent property] was open and obvious, the Beach Club had no duty to warn . . . ."). This includes circumstances where no sign or barrier

called attention to the presence of a hazard or the need for caution. *See Cohen v. State*, 854 N.Y.S.2d at 255–56 (finding no duty to warn of swimming in whirlpool, which was open and obvious hazard).

An important limit on this general principle arises when the danger was not readily apparent, but rather latent. Plaintiffs submit that this is such a case, because the river currents were not readily apparent. It is true that Wakesberg, a City Parks Department inspector, testified that the river in that area had strong currents. Pls.' 56.1 ¶ 59. And in certain circumstances a defendant's knowledge of a condition like a strong current, not apparent to visitors, can give rise to a heightened duty. *Cf. O'Keeffe v. State*, 530 N.Y.S.2d 911, 912 (N.Y. App. Div. 1988) ("Since the swift nature of the current could not be observed . . . , the failure to post any warning or to provide lifesaving equipment constituted a failure to exercise reasonable care to prevent foreseeable injury."). Were it not for D.R.'s undisputed testimony to the contrary, this question might be a closer one. But D.R. testified that on the day of this terrible incident the swift nature of the current was apparent from the rocks abutting the Bridge—indeed, it was for this reason that she, twelve or thirteen at the time, did not enter the water herself. *See* D.R. Dep. 38:10–13 ("[W]hen you get to the beach area, [the water] looked pretty calm, but when you get to the rock area, it looked like really deep and the current was like going fast."); *id.* at 48:9–12 ("[A]t the beach area, it was like still not -- it was calming, but when you get to the rocks like around the rocks, the current was moving fast. It was like moving crazy."); *id.* at 73:24–74:5 ("Q: [D]id you think it would be safe for the boys to jump into water that was really deep and strong at that time? A: No. That's why I didn't jump in. Like I was over thinking it. I kept looking at the water.").

Her testimony, the only evidence in the record as to how the river appeared the day of the incident, undermines Plaintiffs' argument that the current was a latent danger. *See Diven v. Vill. of*

*Hastings-on-Hudson*, 548 N.Y.S.2d 807, 808 (N.Y. App. Div. 1989) ("In the instant case, the infant plaintiff's own deposition testimony establishes conclusively that any danger represented by the cliff in question was open and obvious, rather than latent."); *Cohen v. State*, 854 N.Y.S.2d at 256 ("The observations of the counselors and rescue personnel, as well as the compelling photographic evidence in the record, establish that the whirlpool area was an open and obvious hazard . . . ."); *Chaney v. Starbucks Corp.*, 115 F. Supp. 3d 380, 387 (S.D.N.Y. 2015) ("In other cases in which the plaintiff has admitted observing beforehand the condition that caused his injury, courts have considered that factor in finding the condition open and obvious."); *Leiching v. Consol. Rail Corp.*, 901 F. Supp. 95, 99 (N.D.N.Y. 1995) ("No sign would have warned the plaintiff about anything that he did not already have knowledge. Accordingly, the defendant, as a matter of law, cannot be found negligent for failing to warn . . . .").

Plaintiffs urge the Court to nonetheless reserve the question of whether the condition was open and obvious for the jury. Courts will often do so where there are factual questions in dispute that bear on whether the condition was apparent, but this is not such a case. The river was not obscured, for instance, by poor lighting or vegetation. *Contrast King v. Cornell Univ.*, 990 N.Y.S.2d 329, 332 (N.Y. App. Div. 2014) ("We agree with [the trial court] that a question of fact remains as to whether the cliff's edge was visible and obvious or presented a latent, dangerous condition necessitating an appropriate warning."), *and Cohen v. Elephant Rock Beach Club, Inc.*, 63 F. Supp. 3d at 144, 146 (denying summary judgment "[b]ecause the plaintiff has identified specific facts of record that could enable a reasonable jury to find that the danger posed by the rock [was] not open and obvious," but rather "lurked below the surface" of the water), *with Stempien v. Walls*, 147 N.Y.S.3d 782, 783–84 (N.Y. App. Div. 2021) ("Under the circumstances of this case, we conclude that defendants failed to meet their initial burden on their motion of establishing that the cliff,

together with the manmade seawall, constituted an open and obvious condition inherent or incidental to the nature of the property that could be reasonably anticipated by plaintiff."), *and Tushaj*, 685 N.Y.S.2d at 64 (affirming dismissal of complaint where "plaintiffs' claim that the cliff was hidden by vegetation was incredible as a matter of law" in light of photographic evidence to the contrary). Nor is this a case where the purportedly open and obvious condition was manmade. *Cf. Cohen v. State*, 854 N.Y.S.2d at 256–57 ("The cases of *Mesick v. State of New York* and *O'Keeffe v. State of New York* . . . do not compel a contrary conclusion as they involved man-made hazards that altered naturally existing conditions in such a manner as to affirmatively create a danger."). Because Plaintiffs have not made out a prima facie case that the current was a hidden, latent condition of the river, the Court must conclude that the City did not have a duty to warn of its readily apparent dangers. [9]

The Appellate Division's decision in *Cohen v. State* is particularly instructive. In *Cohen*, four young adults drowned after entering a whirlpool located within a state park. The case "turn[ed] upon whether the whirlpool area . . . presented the type of danger triggering a landowner's duty to take reasonable precautions." *Id.* at 255–56. The court found "[t]he location and appearance of the whirlpool area . . . relevant to this inquiry," explaining that the whirlpool "was not in "a high use area, nor [was] it easily accessible from [one]." *Id.* at 256 (noting it was up to a quarter of a mile from the swimming hole and it was not connected by footpath). The court emphasized that the

---

[9] In a single sentence without supporting citation, Plaintiffs assert that D.R.'s deposition testimony shows "how the current changed just in between the time I.M. got out of the water and M.F. entered the water." Opp'n 6. D.R. testified that she noticed the water "start[ed] moving a little weird" when M.F. was struggling in the water—by which she said she meant that "the current was really strong." D.R. Dep. 27:8–16. She further stated that the "current came stronger" when I.M. tried to rescue M.F. *Id.* at 28:8–11. Even accepting Plaintiffs' interpretation of D.R.'s testimony to mean that the current changed, this does not alter the conclusion that the current presented an open and obvious danger visible from the rocks abutting the Bridge, even before it purportedly grew stronger. *See id.* at 38:10–13. Indeed, it was because of the strength of the current that D.R. did not go into the water herself. *Id.* at 74:3–5.

water was especially "turbulen[t]" the day of the incident and there was "a great deal of . . . white foamy water." *Id.* at 256. It was also apparent from statements of eyewitnesses that several others in the decedents' party were "aware of the high water level and ensuing danger presented by the turbulent conditions," and elected to stay out of the water for that reason. *Id.* Thus, the court concluded:

> The observations of the counselors and rescue personnel, as well as the compelling photographic evidence in the record, establish that the whirlpool area was an open and obvious hazard that comprised a part of the natural environment of the . . . [r]iver, the danger of which was readily apparent to a person reasonably using his or her senses. This, combined with the fact that the area was not easily accessible from the more commonly used main swimming hole, leads us to conclude that defendant did not owe a duty to neutralize the danger presented thereby.

*Id.*

The *Cohen* court further considered and rejected the argument, similar to the one Plaintiffs advance here, that the plaintiffs' failure to understand the mechanics of the whirlpool rendered it a latent danger. *See id.* at 257 ("[T]he unknown mechanics of the whirlpool do not transform it into a latent danger imposing a heightened duty on defendant."). As previously noted, eyewitness testimony in this action suggests that the strong current of the river, and its concomitant danger, was apparent. Whether the river's current is always strong or this was a temporary condition of the water does not alter the analysis, so long as it was evident. *Id.* at 256 ("[Our] conclusion is consistent with those cases which have held that a landowner does not owe a duty with respect to natural transitory conditions existing in bodies of waters . . . ."); *see also Torres*, 961 N.Y.S.2d at 440.

Plaintiffs also attempt to distinguish *Cohen* on the basis that the City knew or should have known that parkgoers swam near the Beach with its strong currents. Opp'n 7. To the contrary, the record indicates that the Beach was not in a high use area of the Park and the City was unaware of

parkgoers swimming in the river. *See* Pls.' 56.1 ¶ 92; Wakesberg Dep. 22:9–12; *see also Cohen v. State*, 854 N.Y.S.2d at 256 (finding of import that the whirlpool "was not [in] a high use area, nor [was] it easily accessible from [one]"). The undisputed evidence is that the Beach was accessible via an unpaved, rocky "trail"; neither this "trail" nor the Beach was designated on the Park map; and even though a Parks Department inspector was aware of the Beach, there is no evidence that the Parks Department or anyone else from the City knew of anyone swimming there, jumping off of the Bridge, or having been previously hurt or injured in that area of the Park. City's 56.1 ¶ 13–14, 39–43; Pls.' 56.1 ¶¶ 58, 92, 96; Wakesberg Dep. 22:9–12; *cf. Mesick*, 501 N.Y.S.2d at 281 (finding the State had a duty because it was aware that someone had tied a rope to a tree, that jagged rocks were located below the rope, and that someone had previously been injured when attempting to swing on the rope and jump into the water).

For the reasons stated above, the Court finds that the City did not have duty to warn of a hazard on Amtrak's adjacent property, and that, in addition, it had no duty to warn of the river or its currents. The City's motion for summary judgment must therefore be granted.

## B. Proximate Cause

The City further contends that it was not a proximate cause of decedents' injuries. At most, it says, it "furnished the condition or occasion for the occurrence." City's SJ Mot. 20. Plaintiffs assert that questions of fact exist as to proximate cause, which preclude summary judgment. Opp'n 9. For the reasons set forth below, the Court finds that—even if the City had a duty to warn—it was not a proximate cause of decedents' injuries.

"In order for a defendant's wrongful act to be a proximate cause of a [claimant's] injury, one must, in view of all the surrounding circumstances, be able to foresee the consequences of defendant's wrongful act." *Fuentes v. Consol. Rail Corp.*, 789 F. Supp. 638, 642 (S.D.N.Y. 1992).

While proximate cause is generally one "to be decided by the finder of fact," *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 668 (N.Y. 1980), it must be decided as a matter of law "where only one conclusion may be drawn from the established facts," *id.* at 670. In light of the undisputed facts of this case, the record compels the Court to find that the City was not a proximate cause of the decedents' injuries.

The City primarily relies on *Escalet v. New York City Housing Authority*, in which a child fell from the top of a fence after crawling through a hole in a different area of the fence and climbing to the top of the fence to reach a ball that had become stuck there. 867 N.Y.S.2d 62, 63 (N.Y. App. Div. 2008). The *Escalet* court dismissed the complaint, finding "the connection between defendant's alleged neglect of the fence and plaintiff's injury . . . too attenuated" to constitute a proximate cause. *Id.* "Rather," the court found, "the presence of the hole in the fence merely furnished the condition or occasion for the occurrence of the event rather than one of its causes." *Id.* As in *Escalet*, the City says, the Park furnished the "condition or occasion for" Plaintiffs to reach the Bridge, but the City's actions were not a cause of the decedents' injuries. *Id.*

Plaintiffs disagree, asserting that proximate cause presents a jury question because "nothing could have been more foreseeable" than that a park visitor might go into the water and drown. Opp'n 10. The record, however, does not support Plaintiffs' position. Indeed, they identify no evidence that the City was aware of others jumping from the Bridge or swimming in the Park in the past. *See generally* Pls.' 56.1.

While it is true that proximate cause is often a question for the jury, this is not always so. Courts frequently find that individuals are the proximate cause of their own injuries as a matter of law when they were aware their conduct was prohibited and/or were cognizant of the dangers posed. *See, e.g.*, *Doyle*, 705 N.Y.S.2d at 396 (where plaintiff was injured after tripping or jumping

over wall surrounding plateau, was in park after its closure, knew he was on a plateau when he ran toward the edge, and there was no latent danger, "[t]he proximate cause of the claimant's injury was his own willful behavior in engaging in hazardous and unlawful conduct"); *Kelsey v. Muskin, Inc.*, No. 86-CV-757, 1987 WL 17075, at *6 (N.D.N.Y. June 25, 1987) ("The court must conclude . . . that plaintiff, based on his observations prior to the accident and common sense, was aware or should have been aware, of the dangers of executing a dive from the railing of the deck. As a result, [plaintiff's] conduct was, as a matter of law, a superseding cause absolving the[] defendants of liability."); *Tillman v. Niagara Mohawk Power Corp.*, 604 N.Y.S.2d 649, 650 (N.Y. App. Div. 1993) (finding plaintiff was "sole legal cause of her injuries" where she had made "recreational use of dam" despite knowledge of its dangers, and defendant "had no knowledge of [anyone] diving or jumping from its dam and had no record of any injuries at the dam"); *De Pena v. New York City Transit Auth.*, 653 N.Y.S.2d 327, 327–28 (N.Y. App. Div. 1997) (finding the boys' conduct in traversing active subway tunnels was the proximate cause of their injuries, where "[t]he recklessness of this activity should have been . . . obvious, even to City lads of such tender age" of thirteen); *cf. Bowen v. Amtrak*, 363 F. Supp. 2d 370, 376 (N.D.N.Y. 2005) ("Trespassers, even children, are usually found to be the proximate cause of their own injuries when they enter upon railroad tracks and are harmed by passing trains."). Although the factual records of these cases are distinct from that of the one at bar, the rationale articulated by these courts is the same: that, because the hazardous nature of the plaintiff's conduct was known or apparent to the plaintiff when they voluntarily engaged in the injury-causing conduct, the resulting injuries were "reasonably foreseeable consequences" of their actions. *Garcia v. City of New York*, 617 N.Y.S.2d 462, 466 (N.Y. App Div. 1994) (finding swimmer, who entered public pool after hours, at night, and while intoxicated was proximate cause of her own injury).

The day of the incident, the dangers posed by jumping from the Bridge into the river were readily apparent. An eyewitness confirmed that the water appeared to be deep and the current seemed strong. D.R. Dep. 38:6–13, 48:4–19. Tragically, M.F.'s words and actions suggest that he too was aware of the dangers the river posed to him as a non-swimmer. Before entering the water, M.F. deliberated for approximately ten minutes, told his friends he could not swim, and expressed concern as to whether he would make it back. D.R. Dep. 25:2–9; City's 56.1 ¶ 29. While I.M. had previously jumped in and out of the water without incident, his friend D.R. observed that the current seemed "really strong" when M.F. was in the water, just before I.M. jumped into the river to help. D.R. Dep. 27:13–16. Plaintiffs, moreover, have not identified evidence that the City had notice of Park visitors swimming in the water, jumping off of the Bridge, or being injured in that area in the past.

The injuries to I.M. and M.F., while heartbreaking, were not foreseeable to the City. On this record, even drawing all reasonable inferences in favor of Plaintiffs, the Court is compelled to conclude that the City's conduct was not a proximate cause of the decedents' injuries. Accordingly, the City's motion for summary judgment on Plaintiffs' negligence claim is granted.

## II.     Remaining Claims

Plaintiffs have also pled claims of negligent hiring and supervision and loss of services against the City. They abandoned them, however, by failing to oppose the City's motion to dismiss these claims. *See Lipton v. Cnty. of Orange, NY*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."). The City's motion for summary judgment with respect to these claims is therefore granted.

**CONCLUSION**

For the reasons articulated above, the Court grants the City's motion for summary judgment in its entirety. The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 62 and 65.

SO ORDERED.

Dated:        September 4, 2025
               New York, New York

Ronnie Abrams
United States District Judge